Fabricant, J.
INTRODUCTION
This wrongful death action arises from a fatal collision between a vehicle operated by Roy Stewart and one operated by Antonio Fazio. Fazio was killed in the collision, leaving his pregnant wife and three young children. The plaintiff, as executrix of the estate of her late husband, seeks to recover damages from two establishments where Roy Stewart drank alcoholic beverages on the evening before the collision. Before the Court are the defendants’ motions for summary judgment. For the reasons that will be explained, Dakota’s motion will be denied, and Locke-Ober’s motion will be allowed.
BACKGROUND
The record before the Court, considered in the light most favorable to the plaintiff, provides the following factual background. As of Wednesday, May 26, 1999, Roy Stewart was President of the Massachusetts Workers’ Compensation Rating Bureau, located on the fifth floor of 101 Arch Street in Boston. He is five feet, ten and a half inches tall, and weighed about 205 pounds at the time. Stewart’s drink of choice at the time was Absolut vodka on the rocks. Absolut vodka is 80 proof.
That afternoon, Stewart drank three Absolut vodka drinks with lunch at Café Marliave, in Boston. His credit card receipt from Café Marliave shows that he paid his bill at “13:31,” or 1:31 p.m.[1] After lunch, Stewart returned to his office, where he conversed with his administrative assistant, Donna LaRose. It did not appear to her, by either smell or observation, that Stewart had consumed any alcohol at lunch.
*270 After work, Stewart went to Dakota’s, which is located on the second floor of 101 Arch Street, and LaRose met him there.[2] Stewart was a regular customer at Dakota’s, and was generally known to its staff, including Andrea Coughlan, who was the server for the table that evening. Coughlan started a tab for the table at 5:36 p.m., although her testimony indicates that Stewart had been served his first drink somewhat earlier than that time; she recalls him arriving at about 5:00. Richard Underwood, an attorney who provided representation to the Rating Bureau, joined Stewart and LaRose at Dakota’s at about 6:30 p.m. Faith Lawlor, a client of Underwood’s, completed the foursome sometime thereafter. The Dakota’s tab for the table shows nine items entered as “extra,” four items entered as “prem br,” and three items entered as “opn wine.” Handwritten notations on the side of the tab indicate nine “extra,” four “heinekin,” and three “p. grigio sp.” Underwood paid the tab for the group. The credit card receipt shows a time of 18:12, or 6:12 p.m., but testimony indicates that the clock was off by an hour, so the actual time was 7:12 p.m.
Stewart, according to deposition testimony of all witnesses who claimed knowledge on the subject, drank Absolut vodka. No one testified to observing him drink anything else. Coughlan testified that, to the best of her recollection, she served Stewart approximately four drinks. Underwood, according to his deposition testimony, was drinking Heinekin beer, and was the only member of the group who did so. LaRose testified that she drank VO and water, and nothing else. According to her testimony, she and Stewart had “a couple” of drinks before Underwood joined them, then “maybe we had another one”; she would be surprised if she had four drinks altogether at Dakota’s, and she certainly did not have five. Stewart, to her observation, had no more to drink than she. No one at the table, according to her testimony, drank wine. Lawlor testified that she had one drink, an Absolut vodka martini. She observed LaRose drinking from a short glass, not a wine glass; she agreed with LaRose that no one at the table was drinking wine. She also testified that Underwood ordered a round of drinks for two or three women at another table who were celebrating a birthday. Underwood did not remember doing so on that occasion, but acknowledged that he might have. Coughlan also did not remember Underwood ordering for another table on that occasion, but acknowledged the possibility. Coughlan did testify, however, that another unidentified individual joined the group for a time and ordered a drink that was recorded as an “extra.” None of the members of the group corroborated that testimony.
Maureen McGovern, Dakota’s manager, appearing on its behalf pursuant to Rule 30b(6), F.R.Civ.P., testified that Dakota’s does not serve “doubles,” and that Dakota’s bartenders do not measure alcohol, but would free-pour approximately two ounces of alcohol for any drink ordered as “straight up” or “on the rocks.” Drinks are entered on the tab in different categories depending on price, with “extra” identifying more expensive drinks, “call” less expensive, and “well” the least expensive. She testified that Absolut vodka would be entered as an “extra,” but that she “believed” a VO would be charged as a “call.” Coughlan, however, testified that she “probably” would have rung a VO and water in as an “extra.”
At a little after six o’clock on the evening in question, McGovern went by the table where Stewart and his companions were sitting, and observed a glass of wine, a bottle of beer, and two “rocks glasses” on the table. She observed Stewart drinking Absolut, Underwood drinking Heineken, and one of the women drinking Pinot Grigio. She testified that “it was my understanding that the second female guest was also drinking Absolut.”
Underwood and Lawlor left Dakota’s at sometime between 7:15 and 7:45, and went to Locke-Ober. Stewart stood up when Underwood and Lawlor left. Stewart and LaRose stayed at Dakota’s somewhat longer, and then joined the other two at Locke-Ober. Surveillance videotapes show them leaving 101 Arch Street through the exit where Dakota’s is located at approximately 7:59 p.m. They went directly to LockeOber, a two- to five-minute walk, and did not consume any alcohol on the way. LaRose testified that Stewart walked “at a rather fast clip.” Stewart had one Absolut vodka drink at Locke Ober, served at approximately 8:18 p.m., along with clam chowder and rolls. LaRose had one VO and water drink, and clam chowder. Stewart and LaRose left Locke-Ober together and walked back to 101 Arch Street, where surveillance tapes recorded their entry at 8:45 p.m. Coughlin saw them enter the building, as did security guards Patrick Holbrook and Walter Alukonis.
With the exception of visits to the restroom, LaRose and Stewart stayed together in the office until they left the building together. LaRose did not observe Stewart consume anything. Surveillance tapes show them walking through the garage at 101 Arch Street at 10:58 p.m., and then driving out. Stewart drove to the Mansfield train station, where LaRose had left her car; he dropped her off there at approximately midnight. Stewart then proceeded north on Route 495 to Route 1, where the collision occurred in Wrentham a few minutes later. LaRose, Underwood, Lawlor, McGovern, and Coughlin all testified that they never observed Stewart exhibit any sign of intoxication at any time during the evening. McGovern and Coughlin were trained to identify signs of intoxication, and were working in capacities that required them to do so. Lawlor also had such training, having worked as a bartender and restaurant server. Security guards Alukonis and Holbrook also testified that they observed no sign of intoxication when they saw Stewart returning to the building at 8:45 p.m.
Stewart testified at his deposition that he does not remember the events of May 26, 1999. He further *271 testified that it was not unusual for him to have three drinks at lunch, and up to four or five drinks in a two-hour period in the evening, but it would not be possible for him to have had eight vodka drinks in that period. No one has ever told him how he acts when he has consumed an excessive amount of alcohol, and he does not know whether he exhibits any particular behavioral signs. He has never ordered or drank a drink identified as a “double” at Dakota’s. A police report reflects that after the collision Stewart told police he had consumed approximately three shots of vodka that evening. Stewart also testified that he had a box containing miniature bottles of Absolut in his office that had been given to him as a gift some time earlier, but that he had never opened that box, he had never drunk in the office except at an occasional holiday party, and he had never drunk in his car.
The collision occurred at approximately 12:07 a.m. on May 27, 1999. A test of Stewart’s blood, drawn at approximately 1:45 a.m., showed a blood serum alcohol concentration of 1943 milligrams of alcohol per liter. Richard Saferstein, the plaintiffs expert, explains in his affidavit that that result is equivalent to a blood alcohol concentration of 0.167 percent. Based on that figure at that time, and the assumption that Stewart absorbed alcohol within 60 minutes and eliminated alcohol at “the average rate of 0.015% per hour,” Saferstein opines that Stewart had a blood alcohol concentration of approximately 0.15 percent at 8:18 p.m., and 0.18 percent at the time of the collision.[3] Most people, Saferstein opines, exhibit visible signs of intoxication at a level of 0.10 percent or more. On that basis, he asserts, it is more probable than not that Stewart was exhibiting visible signs of intoxication by 8:18 p.m. Saferstein further opines that Stewart consumed 18 ounces of alcohol between 5:30 p.m. and 8:35 p.m. to reach those levels.[4]
Dakota’s offers an affidavit of its expert expressing the view that Stewart’s blood alcohol concentration at the time he was last served at Dakota’s was .04 percent, based on the assumption that Stewart drank three or four drinks at Dakota’s, and that as a heavy drinker he eliminates alcohol at a rate of 0.02% per hour. At that level, Dakota’s expert opines, only four percent of the population would show visible signs of intoxication. In response, the plaintiff provides a supplemental affidavit of Saferstein, to the effect that, using Dakota’s expert’s elimination rate of 0.02 percent pier hour, his opinion would be that Stewart consumed 23 ounces of alcohol between 5:30 and 8:30 p.m.
DISCUSSION
This court grants summary judgment where there are no genuine issues of material fact and where the summary judgment record entitles the moving party to judgment as a matter of law. See Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.RCiv.P. 56(c). The moving party bears the burden of demonstrating that there is no genuine issue of material fact on every relevant issue. See Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case, or by showing that the non-moving party has no reasonable expectation of proving an essential element of its case at trial. See Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond with evidence of specific facts showing the existence of a genuine dispute. See Pederson v. Time, Inc., 404 Mass. at 17.
The plaintiffs’ claims against each defendant are based on the contention that each defendant negligently served Stewart alcohol at a time when Stewart was intoxicated. To prove those claims, the plaintiff must show that each defendant served Stewart at a time when a reasonable person in the position of that defendant would have known that Stewart was intoxicated. See Bennett v. Eagle Brook Country Store, Inc., 408 Mass. 355, 358 (1990); Cimino v. The Milford Keg, Inc., 385 Mass. 323, 327 (1982). To meet that burden, “a plaintiff must come forward with some evidence that the patron’s intoxication was apparent at the time he was served by the defendant.” Douillard v. LMR, Inc., 433 Mass. 162, 164-65 (2001). “The negligence lies in serving alcohol to a person who already is showing discemable signs of intoxication.” Vickowksi v. PolishAmerican Citizens Club, 422 Mass. 406, 610 (1996), and cases cited.
A plaintiff can make the required showing by either direct or circumstantial evidence, or a combination of the two. See Doullard v. LMR, Inc., 433 Mass. at 165; see also Cimino v. Milford Keg, Inc., 385 Mass. at 328 (evidence that patron was served six or more white Russians and became “loud and vulgar” sufficed). The patron’s consumption of a large quantity of alcohol is a circumstance that, in itself, can support the necessary inference. See Vickowski, supra, at 611 (“a juiy confronted with evidence of a patron’s excessive consumption of alcohol properly could infer, on the basis of common sense and experience, that the patron would have displayed obvious outward signs of intoxication while continuing to receive service”). In Vickowski, however, the Court held that four or five bottles of beer over approximately two hours did not suffice to support the necessaiy inference, in the absence of any direct evidence that the patron showed signs of intoxication when served. Other cases, similarly, have held substantial quantities insufficient absent other evidence. See Kirby v. Le Disco, Inc., 34 Mass.App.Ct. 630, 632 (1993) (eight beers); Makynen v. Mustakangas, 39 Mass.App.Ct. 309, 314 (1995) (five or six cans of beer).
A subsequent blood alcohol level does not suffice in itself to meet the plaintiffs burden, but such evidence *272 may bolster other evidence to form a set of facts sufficient to support an inference. See Douillard, supra at 165-66. In Douillard, on review of a grant of summary judgment, the Supreme Judicial Court accepted proffered expert testimony similar to that offered by the plaintiff here as part of the circumstantial evidence that it held sufficient. The expert there, like Saferstein here, extrapolated from a subsequent blood alcohol level to form opinions both as to the amount of alcohol the patron had consumed, and as to his blood alcohol concentration at the time he was last served, as well as the signs of intoxication most people would show at that level. There, as here, the patron’s companions testified that the patron did not show such signs. Unlike in this case, however, the evidence there indicated that the patron had a history of displaying visible signs when intoxicated, and the patron himself acknowledged that he would be intoxicated at a level of consumption lower than the amount the expert opined would have been required to reach the blood alcohol concentration later shown. See id. at 166-67. The Court held the combination sufficient to survive summary judgment. Compare Kirby v. Morales, 50 Mass.App.Ct. 786, 793 (2001) (expert testimony properly excluded in absence of evidence as to patron’s reactions to excessive consumption, and where evidence left unclear whether patron may have consumed additional alcohol after leaving defendant’s premises).
Here, the testimony of everyone known to have observed Stewart at any relevant time is that he displayed no sign of intoxication. Nor is there any evidence that he has any history of displaying any such signs when intoxicated, although he acknowledged having been intoxicated previously. Thus the combination that the Court found sufficient in Douillard is absent. Although no evidence would support a finding that Stewart drank after he left LockeOber, the case more closely resembles Kirby than Douillard. Whether Saferstein’s opinion would be admitted at trial is thus open to serious question.
With or without Saferstein’s opinion, however, the evidence provides a basis on which a jury could find that Dakota’s served Stewart a large quantity of alcohol. The evidence would certainly support Dakota’s contention that Stewart had three or four vodka drinks; indeed that conclusion would be most consistent with the evidence as a whole. Nevertheless, by accepting certain parts of the evidence and rejecting other parts, a jury could find that Stewart had as many as eight drinks at Dakota’s, within about two hours (between shortly before 5:36 and 7:12).
The tab shows nine “extras.” Lawlor had one, leaving eight. Although Coughlan testified that a fifth patron joined the group and had one drink, a jury could reject that testimony, which is not corroborated by any of the other members of the group. A jury could also reject Coughlin’s testimony that she would have entered VO and water as an “extra,” along with Lawlor’s testimony that Underwood ordered drinks for another table, and could accept McGovern’s testimony that VO and water would be a “call,” as well as her observation that one of the women at the table was drinking wine. Based on those credibility determinations, a jury could find that LaRose, contrary to her testimony and that of Lawlor, did not drink VO and water at Dakota’s, but drank wine. Those findings would leave eight vodka drinks, each containing two ounces of 80 proof alcohol, all attributable to Stewart. On this theory, at the time his last drink was served, Stewart would have had fourteen ounces. That quantity is substantial enough in itself to put Dakota’s on notice of his likely intoxication, even absent behavioral manifestations. See Vickowksi v. Polish American Citizens Club, 422 Mass. at 611. The evidence thus presents a genuine dispute of material fact for trial as to the plaintiffs claim against Dakota’s.
Locke-Ober is a different matter. That establishment served Stewart a single drink in the period of about one half hour he spent there. Nothing in the evidence indicates that Locke-Ober had any information about what Stewart had consumed before he arrived there. The plaintiffs case against Locke-Ober thus depends entirely on Saferstein’s opinion that, given what Saferstein believes to have been Stewart’s blood alcohol concentration at that time, and the behaviors most people manifest at that concentration, Stewart must have manifested such behaviors, even though all observers testify that he did not, and no evidence indicates that he has any history of doing so. To accept such evidence as sufficient would be to exalt expert opinion as to probability over direct evidence of individual circumstances in the particular case. Douillard does not support such an approach. The Court concludes that no genuine dispute of material fact exists with respect to the plaintiffs claims against LockeOber, and Locke-Ober is entitled to judgment as a matter of law.
CONCLUSION AND ORDER
For the reasons stated, the defendant Lincoln Restaurant Group, Inc. d.b.a Dakota’s Restaurant’s Motion for Summary Judgment is DENIED, and the defendant Locke-Ober Company’s Motion for Summary Judgment is ALLOWED.

A11 parties’ motion papers appear to assume that Stewart left Marliave at 2:31 p.m. The point is not material to the issues presented.

The parties agree that “Lincoln Restaurant Group, Inc. d/b/a/ Dakota’s Restaurant” is a misnomer, and that the correct name of the establishment is “Boston Dakota’s, Inc.” Dakota’s manager, Maureen McGovern, testified that Lincoln Restaurant Group is a restaurant management company that manages Dakota’s along with a number of other establishments.

A graph appended to Saferstein’s affidavit shows Stewart’s blood alcohol concentration at approximately .09 percent at 7:15 p.m., and at a peak of .22 percent at 9:35 p.m.

 Defendants, although expressing considerable doubt as to the basis and reliability of Saferstein’s opinions, have not moved to strike his affidavit, and have not made any explicit *273 reference to the Court’s role In screening expert testimony pursuant to Commonwealth v. Lanigan, 419 Mass. 15, 26 (1994), and related cases. Their failure to do so at this stage does not preclude their doing so at or before trial. See Douillard v. LMR, Inc., 433 Mass. 162, 166 n.1 (2001).