JUAN RIVERA & others[1] *vs.* CLUB CARAVAN, INC., & others.[2]

No. 09-P-750.

Suffolk. January 19, 2010. - June 11, 2010.

Present: DUFFLY, RUBIN, & MILKEY, JJ.

*Negligence,* Sale of liquor, Tavern, Motor vehicle. *Alcoholic Liquors,* Sale to intoxicated person, Motor vehicle. *Intoxication. Evidence,* Intoxication. *Practice, Civil,* Argument by counsel. *Corporation,* Corporate disregard. *Fraudulent Conveyance.*

At the trial of a negligence action brought by plaintiffs against the intoxicated driver of a motor vehicle, as well as the various entities and individuals that owned or operated the bar that had served the driver, the plaintiffs' proof did not fail as a matter of law, despite the lack of direct evidence the driver was exhibiting outward signs of intoxication before he was served his last drink [20-21]; further, a curative jury instruction given by the judge was sufficient to respond to an improper comment made by the plaintiffs' counsel during his opening statement that referred to the driver's blood alcohol level, and the judge did not abuse his discretion in declining to grant a mistrial [21-22]; however, the judge erred in denying the defendant realty trust's motion for judgment notwithstanding the verdict, where the plaintiffs' liability case against the realty trust failed as a matter of law, regardless of whether it was viewed as a one based on a "veil piercing" theory of liability or one based on successor liability [22-25]; lastly, the judge correctly instructed the jury that the corporate entity that owned the bar's real estate assets at the time of the accident could not be held liable based solely on a theory of respondeat superior, without a showing of veil piercing, unless the corporation actually employed the server who served the driver [25-26].

At the jury-waived portion of the trial of a negligence action brought by plaintiffs against the intoxicated driver of a motor vehicle, as well as the various entities and individuals that owned or operated the bar that had served the driver, the judge erred in voiding the post-accident sale of the bar's real estate to the defendant realty trust, where the sale was for market value to a good-faith transferee, and the judge specifically found that the

---

[1]Gerald Shea and Tricia Shea.

[2]Caravan Realty, Inc.; Rockwal Entertainment, Inc.; Jean Geary, in her capacity as trustee of the Rockwal Realty Trust, and June Solimeno.

The driver, John Bright, was also originally a defendant, but he has since settled and is not, in any event, a party to this appeal.

transfer was not made with any intent to defraud creditors; further, remand was required for consideration of what other relief, if any, was appropriate with regard to the payments owed by the realty trust. [26-27]

CIVIL ACTIONS commenced in the Superior Court Department on February 12, 2001; March 26, 2001; and September 10, 2002.

The cases were tried before *Thomas P. Billings,* J.

*Charles P. Kindregan, III,* for Club Caravan, Inc., & others.

*Paul F. Denver* for Juan Rivera.

*Timothy M. Burke* for Gerald Shea & another.

MILKEY, J. In the early morning hours of January 28, 2001, a drunk driver slammed into a State police cruiser that was parked in the breakdown lane of Route 24. As a result, Trooper Gerald Shea and Juan Rivera, a stranded motorist that Trooper Shea had stopped to assist, were severely injured. They brought negligence claims against the driver and various entities and individuals that owned or operated the bar in Revere that had served the driver.[3] A Superior Court jury found all of the defendants liable and awarded total damages of almost five million dollars. In a jury-waived portion of the trial, the judge voided sales of the business and underlying real estate as fraudulent conveyances, thereby allowing the plaintiffs to reach and apply those assets to satisfy the judgment. The owners and operators of the bar appeal on various grounds.[4] We affirm in part and reverse in part.

*Background.* On the evidence, the judge and jury could have found the following facts.

1. *The accident.* Sometime around midnight on January 27, 2001, John Bright arrived at the Club Caravan bar in Revere to drink with friends. While there, he was served fourteen drinks (seven rounds of cognac shots with beer "chasers"), most of which he finished. Bright felt intoxicated while at the bar and was stumbling by the time he left around 2:00 A.M. After stopping to get food at a local restaurant, Bright drove south, and he

---

[3]The trooper's wife, Tricia Shea, also sued for loss of consortium.

[4]June Solimeno, a principal in two of the corporate defendants, was sued in her individual capacity. After judgment, she was discharged in bankruptcy and has not appealed.

crashed into Trooper Shea's cruiser at approximately 3:30 A.M. Bright pleaded guilty to driving under the influence, for which he served jail time.

2. *The relationship between the parties.* Rocco Solimeno founded the Club Caravan bar, and he operated it through two corporations that he owned and controlled: Club Caravan, Inc., held the liquor license and ran the business, while Caravan Realty, Inc. (Caravan Realty), owned the underlying real estate. After Rocco Solimeno died in 1993, his widow, June Solimeno, acquired ownership of the corporations, although she had little direct involvement with running the bar. June Solimeno's daughter, Jean Geary, served that role.

In 2000, Jean Geary and her husband formed a new corporation, Rockwal Entertainment, Inc. (Rockwal Entertainment), to purchase the bar from her mother. Although June Solimeno wanted to give the bar to her daughter, Jean Geary and her husband insisted on paying for it. The parties agreed on a total price for the business and underlying real estate of $450,000,[5] with Rockwal Entertainment to make monthly payments of approximately $4,200. In November, 2000 (two months before the accident), June Solimeno and the Gearys filed an application to transfer the liquor license to Rockwal Entertainment (eventually approved in May of 2001). The application recited that Rockwal Entertainment would start paying "rent" of $3,000 per month as of January 1, 2001.

On January 1, 2001 (four weeks before the accident), Rockwal Entertainment took over the business's finances and began making total monthly payments of $4,200 to June Solimeno.[6] However, the sale of the business was not formalized until February 1, 2002, when Rockwal Entertainment executed an

---

[5]Of this amount, $112,000 was for the business (including the liquor license) to be paid over ten years, and $338,000 was for the real estate to be paid over fifteen years. The agreed-to purchase price for the real estate was apparently based on the city's property tax assessment at the time.

[6]The parties do not dispute that monthly payments in the amount of $4,200 to June Solimeno began on January 1, 2001, and continued at least until the time of trial. They also do not dispute that, before the realty trust purchased the real estate, Rockwal Entertainment made the first two of these payments. The jury reasonably could have inferred that Rockwal Entertainment was the entity that continued to make the payments until the trust acquired the property in August of 2002.

interest-bearing promissory note to June Solimeno. The formal transfer of the underlying real estate did not occur until August 1, 2002. On that day, June Solimeno had the long-defunct record owner, Caravan Realty, transfer title of the real estate to herself for one dollar. She then transferred title to Rockwal Realty Trust (realty trust), a realty trust created that day to receive title on behalf of the Gearys.[7] The realty trust executed an interest-bearing promissory note to June Solimeno, and it provided her security by granting a mortgage on the real estate. At the time of sale, the preacquisition payments made to June Solimeno by Rockwal Entertainment were not treated as installments on the sale of the real estate. Instead, the promissory note (and corresponding mortgage) that the realty trust gave to June Solimeno when the real estate was transferred on August 1, 2002, was for the full purchase price ($338,000), without credit given for any prior payments, and the life of the loan was to run the full fifteen years from the date of transfer. The parties do not dispute that June Solimeno and the Gearys were unaware of the accident and of their potential liability for it until after the transfer of the bar and underlying real estate was completed.

*Discussion.* 1. *Jury trial.* We will first address the arguments that apply to all of the appellants (collectively, the bar-related defendants) and then address those that have a more limited application.

(a) *Sufficiency of outward signs of intoxication.* To prevail in a dram shop case, a plaintiff must prove by a preponderance of the evidence that the patron in question was exhibiting outward signs of intoxication by the time he was served his last alcoholic drink. *Vickowski* v. *Polish Am. Citizens Club of Deerfield, Inc.,* 422 Mass. 606, 610 (1996). However, a plaintiff can establish this with circumstantial proof. "In other words, a jury confronted with evidence of a patron's excessive consumption of alcohol, properly could infer, on the basis of common sense and experience, that the patron would have displayed obvious outward signs of intoxication while continuing to receive service from the licensee." *Id.* at 611. Contrary to suggestions made by the

---

[7]For clarity, we shall refer to the realty trust entity itself even though any transactions involving the realty trust were formally undertaken by Jean Geary as trustee.

bar-related defendants, some quantum of direct evidence that the patron was exhibiting outward signs of intoxication is unnecessary; circumstantial proof alone can suffice if it is sufficiently robust. See *Cimino* v. *Milford Keg, Inc.*, 385 Mass. 323, 328 (1982) (service of "large number of strong alcoholic drinks" deemed "sufficient to put the defendant on notice that it was serving a man who could potentially endanger others"). See also *Vickowski, supra* at 611 ("Direct evidence of obvious intoxication is not necessarily an essential part of a plaintiff's proof"); *Douillard* v. *LMR, Inc.*, 433 Mass. 162, 165 (2001) (plaintiff may prove apparent intoxication of bar patron "by direct evidence, circumstantial evidence, or a combination of the two").

Although there was no direct evidence that Bright was exhibiting outward signs of intoxication before he was served his last drink (and some testimony to the contrary), the plaintiffs' proof did not fail as a matter of law. Where the jury could have concluded that Bright was served fourteen drinks over a two-hour period and drank "most" of them, it was for the jury to decide whether Bright likely appeared intoxicated before he was served his last drink. Compare *Cimino* v. *Milford Keg, Inc., supra* at 325, 328 (service of "six or more 'White Russians' " deemed sufficient circumstantial proof), with *Vickowski, supra* at 611 (insufficient proof where patron, "who was in the habit of drinking beer, 'sipped' four to five bottles over the course of approximately two hours").

(b) *Opening statement.* During the opening statement of the Sheas, counsel stated that Bright had a blood alcohol level of 0.20. Defense counsel immediately objected on the ground that no evidence of Bright's blood alcohol level would be forthcoming and asked for a mistrial. After a side bar conference, the judge struck the reference to the blood alcohol level and instructed the jury as follows: "there will be no evidence in this case concerning Mr. Bright's blood alcohol content . . . [s]o it should not have been referred to in the opening and the jury is instructed to disregard it." In this manner, the judge did more than generally instruct the jury to confine themselves to the evidence, he instructed them to disregard the specific comment made by plaintiffs' counsel. Compare *Kirby* v. *Morales*, 50 Mass. App.

Ct. 786, 794 (2001) ("the judge's charge to the jury, which contained the usual admonishment that they not treat as evidence statements in the opening, was a sufficient response to the comments complained of"). We conclude that the judge's curative instruction was sufficient and that he did not abuse his discretion in refusing to grant a mistrial.

(c) *Liability of the realty trust under "veil piercing."* The realty trust argues that, as a matter of law, there was insufficient evidence to establish its liability, and that its motion for judgment notwithstanding the verdict therefore should have been granted.[8] We agree.

The realty trust was not created until eighteen months *after* the accident occurred. Thus, whoever served the alcohol to Bright was not employed by the realty trust, an entity that did not yet exist, and the realty trust could not be liable based solely on a theory of *respondeat superior.* Instead, the trust could be liable for the actions of the servers only if it was somehow derivatively liable because of its relationship with those who did employ them.

The plaintiffs rely on a theory of "veil piercing" in an attempt to establish the requisite chain of derivative liability. See *My Bread Baking Co.* v. *Cumberland Farms, Inc.,* 353 Mass. 614, 618-619 (1968) (discussing "[t]he circumstances in which one corporation, or a person controlling it, may become liable for the acts or torts of an affiliate or a subsidiary under common control"). The Supreme Judicial Court has set forth twelve factors to be considered in determining whether to disregard the corporate form (or other business forms that would ordinarily provide limited liability). See *Attorney Gen.* v. *M.C.K., Inc.,* 432 Mass. 546, 555 & n.19 (2000). The judge gave the jury broad license to find any one of the defendants "responsible" for the accident if they concluded that veil piercing was applicable based on these twelve factors. The realty trust argues that the

---

[8]In their respective complaints, the plaintiffs joined the realty trust merely as a reach and apply defendant based on their claim that the transfer of the real estate to the realty trust was a fraudulent conveyance (the merits of which are discussed separately, *infra*). The realty trust has not argued below, or on appeal, that the broad veil piercing theory on which the case was sent to the jury was at variance with the plaintiffs' complaints.

jury could not reasonably have found it liable under any veil piercing scenario.[9]

As a prefatory matter, we note that the plaintiffs never sought to pierce the veil of the realty trust in order to hold the beneficiaries of the trust (the Gearys) liable in their personal capacities. See *Morrison* v. *Lennett*, 415 Mass. 857, 862 (1993) (noting that courts may, in appropriate circumstances, impose liability directly on the beneficiaries of a nominee trust). Nor is this a case where the plaintiffs were seeking to reach the Gearys' beneficial interests in the realty trust based on their personal liability.[10] The personal liability of the Gearys was never put at issue.

The only bar-related defendant with which the realty trust had an ongoing affiliation was Rockwal Entertainment. We therefore begin by examining whether the theory of veil piercing is applicable to the relationship between these two entities. The Supreme Judicial Court has made it clear that veil piercing is proper "only in 'rare particular situations,' and only when an 'agency or similar relationship exists between the entities.' " *Scott* v. *NG US 1, Inc.*, 450 Mass. 760, 767 (2008), quoting from *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, *supra* at 619, 620. Since the realty trust was not created until August of 2002, its relationship with Rockwal Entertainment did not commence until long after the incident that gave rise to the liability. Under such circumstances, a request to disregard the separate identities of the two affiliated entities faces — at a minimum — an especially high hurdle. Compare *Scott* v. *NG US 1, Inc.*, *supra* at 769 (no liability based on "veil piercing" found where parent corporation acquired subsidiary decades after the event that gave rise to liability).

---

[9]The judge accurately identified the twelve factors for the jury, but did not provide them specific direction as to how veil piercing should be applied to any given defendant. Thus, for example, he did not specify what other entities would face derivative liability in the event that any particular corporate form were disregarded. Although the realty trust below objected to the jury instructions on veil piercing as "very, very muddy," on appeal, it does not argue that the case against it must therefore be sent back for retrial. Instead, the realty trust relies principally on its claim that the evidence was insufficient. To the extent it does argue that the instructions were erroneous, we need not resolve that question.

[10]Such a claim would not have been one for veil piercing.

There is only one argument of any appreciable substance that might be made for disregarding the separate identities of the two affiliated entities: that Rockwal Entertainment was effectively siphoning off significant corporate resources to the realty trust.[11] Cf. *Attorney Gen.* v. *M.C.K., Inc.*, *supra* at 555-556 (upholding piercing of corporate veil in part based on "the siphoning of corporate assets" to the principal and related entities controlled by the principal). Regardless of whether such an argument might otherwise have some merit, the plaintiffs failed to develop the point adequately to send the issue to the jury. We note, for example, that there was no direct evidence of who made the monthly payments to June Solimeno after the realty trust took title on August 1, 2002.

The only other bar-related defendants with which the realty trust had any significant relationship were Caravan Realty and June Solimeno, the realty trust's predecessors in title. Given the nature of that relationship, any potential derivative liability that the realty trust faced as the successor to these interests should have been presented as one for successor liability, not veil piercing. For the sake of completeness, we examine whether the realty trust could have been held liable as successor.

We start with the proposition that "generally speaking, the liabilities of a predecessor [entity] are not imposed on the successor [entity] that purchases its assets." *Milliken & Co.* v. *Duro Textiles, LLC*, 451 Mass. 547, 560 (2008). At trial, the plaintiffs offered no proof that the realty trust expressly or impliedly assumed the liabilities of either Caravan Realty or June Solimeno when it purchased the real estate or that the realty trust merged with Caravan Realty. Nor is this a case where "the imposition of liability on the purchaser is justified on the theory that, in substance if not in form, the purchasing corporation is the same

---

[11] If the two entities were treated as one, then the realty trust would be considered liable beyond the funds that were transferred to it. Claims that an entity transferred away valuable assets without receiving commensurate consideration probably fit better into a fraudulent conveyance framework, in which the potential remedy would be the return of the value improperly transferred. Although the plaintiffs did bring a fraudulent conveyance claim, that was based on the transfer of the real estate from June Solimeno to the realty trust, not any separate transfer of funds from Rockwal Entertainment to the realty trust.

company as the selling corporation." *McCarthy* v. *Litton Indus., Inc.*, 410 Mass. 15, 22 (1991). Although the familial relationships no doubt affected the manner in which the transactions were conducted, the plaintiffs made no showing that the sale of the real estate for $388,000 was for less than market value. Under these circumstances, none of the recognized exceptions through which a successor entity can be held liable apply, and any case against the realty trust grounded in successor liability would fail as a matter of law. See *Milliken & Co.* v. *Duro Textiles, LLC*, *supra* at 556.

In sum, we conclude that the plaintiffs' liability case against the realty trust failed as a matter of law, regardless of whether it is viewed as one based on "veil piercing" or one based on successor liability. The judge therefore erred in denying the realty trust's motion for a judgment notwithstanding the verdict.

(d) *Liability of Caravan Realty.* One issue remains as to that portion of the case that went to the jury. Caravan Realty, the former owner of the real estate, argues that the jury's determination that it was "responsible" must be overturned and sent back for new trial. Unlike the realty trust, Caravan Realty does not dispute that it could be reached on a veil piercing theory (a fact that is unsurprising given the extent to which June Solimeno ignored corporate formalities). Instead, Caravan Realty argues that the judge improperly instructed the jury that it could potentially be liable under a respondeat superior theory. It further argues that a new trial is required because the jury may have relied on such an improper theory. See *Blackstone* v. *Cashman*, 448 Mass. 255, 271 (2007) (where jury presented with two alternative theories, and appellate court is unable to determine on which theory jury relied, error as to one theory requires reversal). We disagree.

This is not a case where the jury faced two distinct alternative theories of liability. Instead, under the case as presented, liability against any of the bar-related defendants had to rest on a theory of respondeat superior. For those bar-related defendants that did not themselves employ the server, the plaintiffs additionally had to show that the defendant was derivatively liable because of its relationship to an entity that did employ the server. We conclude that the judge's instructions made it sufficiently clear that the owner of the real estate could not be held liable based solely on a

theory of respondeat superior (that is, without "veil piercing" also shown) unless it actually employed the server.[12] Thus, there was no reversible error as to Caravan Realty.

2. *Jury-waived trial.* (a) *Liability of the realty trust for fraudulent conveyance.* The plaintiffs' claims indisputably arose while Caravan Realty still owned the real estate. It is also indisputable that the transfer of the real estate from Caravan Realty to June Solimeno for only nominal consideration rendered Caravan Realty insolvent. Therefore, even though the transfer was not made with any intent to defraud creditors, that transfer was plainly "fraudulent" within the meaning of G. L. c. 109A, § 6(*a*). The bar-related defendants do not argue to the contrary.

However, it does not follow that the judge could properly void the subsequent transfer of the real estate from June Solimeno to the realty trust. Pursuant to G. L. c. 109A, § 9(*b*)(2), inserted by St. 1996, c. 157, a judgment voiding such a fraudulent conveyance may not be entered against a "good-faith transferee or obligee who took for value." From all that appears on the record, the sale of the real estate to the realty trust was for full market value, and the judge specifically found that this transfer was not made with any intent to defraud creditors. The realty trust was a good-faith transferee who took for value,[13] and the judge therefore erred in voiding the sale to it simply because there was a fraudulent conveyance within the meaning of § 6(*a*) earlier in the chain of title.[14]

Our analysis does not end there, however, because voiding the sale of the real estate from Caravan Realty to June Solimeno

---

[12]The judge specifically instructed: "The fact that a[] person or entity owns the real estate on which the establishment is located or does business, does not by itself mean that it is liable for the negligence of the server, the waitress, unless that entity happens to employ the server."

[13]The fact that the realty trust presumably knew of the nature of the transaction from Caravan Realty to June Solimeno does not mean that it acted in bad faith. As noted above, the sale was done without any knowledge of the accident or of any of the bar-related defendants' potential liability. Further, for purposes of determining whether the sale from June Solimeno to the realty trust was "for value," it matters not whether the realty trust or Rockwal Entertainment made the monthly payments on the note that the realty trust gave back to June Solimeno in the sale.

[14]On appeal, the bar-related defendants have not argued that the judge erred in voiding the separate sale of the business to Rockwal Entertainment. That argument is therefore waived.

was not the only remedy available. See G. L. c. 109A, § 8 (providing judges broad authority to remedy fraudulent conveyances). The proceeds from the sale of the real estate should properly have gone to the two Caravan corporations, not directly to June Solimeno. On the record before us, it appears that the realty trust still owes substantial payments on the promissory note and corresponding mortgage nominally held by June Solimeno. At least prior to June Solimeno's intervening bankruptcy action, the judge could have allowed the plaintiffs to reach and apply the note and the mortgage as an alternative to voiding the sale of the property. The parties have not briefed how these assets were treated in the bankruptcy proceeding, or how any discharge in that proceeding may have affected the plaintiffs' ability to reach and apply them. Compare *Citizens Bank of Mass.* v. *Callahan*, 38 Mass. App. Ct. 702, 704 (1995) (discharge in bankruptcy did not bar creditor from pursuing relief under the fraudulent conveyance act); *One to One Interactive, LLC* v. *Landrith*, 76 Mass. App. Ct. 142, 149 (2010) (after discharge in bankruptcy, debt remains in existence even if it cannot be enforced against discharged debtor). We remand this matter for the Superior Court to consider what other relief, if any, is appropriate with regard to the payments owed by the realty trust.

*Conclusion.* So much of the amended judgments as orders Jean Geary, in her capacity as trustee of the Rockwal Realty Trust, be held liable is reversed, and in all other respects, the amended judgments are affirmed. So much of the separate orders for judgment with regard to the fraudulent conveyance claims as voids the sale of the real estate and as states that the plaintiffs may reach and apply that real estate is reversed, and in all other respects the separate orders are affirmed.[15] The fraudulent conveyance claims regarding the transfer of the real estate are remanded to the Superior Court for consideration of whether any other relief is appropriate consistent with this opinion.

*So ordered.*

---

[15]We note that the order for judgment as currently drafted refers to the real estate being sold to Rockwal Entertainment. The parties agreed at oral argument that this was a typographical error since it is uncontested that the real estate was sold to the realty trust.