TERRY vs. HOSPITALITY MUTUAL INSURANCE COMPANY, 101 Mass. App. Ct. 597

 
 WILLIAM TERRY vs. HOSPITALITY MUTUAL INSURANCE COMPANY.

101 Mass. App. Ct. 597
 May 2, 2022 - August 31, 2022

Court Below: Superior Court, Norfolk County
Present: Vuono, Sullivan, & Lemire, JJ.

 

No. 21-P-530.

Alcoholic Liquors, Sale to intoxicated person. Insurance, Liquor liability insurance, Settlement of claim, Unfair act or practice. Consumer Protection Act, Insurance, Offer of settlement, Unfair act or practice. Evidence, Intoxication.

In a G. L. c. 93A and G. L. c. 176D action brought in Superior Court by a plaintiff who had attempted to negotiate a settlement with a liquor liability insurer (insurer) for serious injuries suffered in a fight that occurred after he and the two men who assaulted him had participated in a tournament at a sports pub, ample evidence supported the judge's conclusion that the insurer violated its obligation to conduct a prompt and reasonable investigation by cherry-picking facts that supported its initial position (i.e., that its insured's liability was doubtful) and by discarding, or at least diminishing the significance of, the considerable amount of contrary information [604-607]; further, the judge correctly applied the appropriate standard in determining that liability was reasonably clear (i.e., that the two men who assaulted the plaintiff were visibly intoxicated when they were served alcohol at the pub and that they were the aggressors in the fight), and there was no error in the judge's determination that, despite the plaintiff's lack of credibility, the defendant's settlement offer was unreasonable, given uncontroverted objective evidence of the plaintiff's lasting, serious injury [607-611].

Civil action commenced in the Superior Court Department on August 25, 2016. 

 The case was heard by Beverly J. Cannone, J. 

 John F. Brosnan (James E. Harvey, Jr., also present) for the defendant.

 Mark A. Aronsson (David M. Bae also present) for the plaintiff.

 VUONO, J. The plaintiff, William Terry, was seriously injured in a fight that occurred after he and the two men who assaulted him, Michael Connors and Kilder Cardona, participated in a beer pong tournament at the Canton Junction Sports Pub (Canton Junction) in Canton. After Connors and Cardona pleaded guilty to criminal charges arising from the assault, and after Connors separately 

 Page 598 

pleaded guilty to driving under the influence of alcohol when he fled from the scene, Terry sent a demand letter dated July 30, 2013, to, among others, Canton Junction's liquor liability insurer, Hospitality Mutual Insurance Company (Hospitality). Terry claimed that (1) he suffered a traumatic brain injury and (2) Canton Junction was liable for serving alcohol to Connors and Cardona when they were visibly intoxicated and for failing to provide adequate security. The letter included a $5 million settlement demand. After Hospitality declined to settle, Terry filed a lawsuit on September 19, 2013, asserting dram shop negligence and negligent security claims against Canton Junction (dram shop action). [Note 1], [Note 2]

 Before the dram shop trial commenced, Terry continued his attempts to negotiate a settlement with Hospitality over Canton Junction's liability and reduced his settlement demand to $1 million and then to $975,000, but Hospitality's highest pretrial settlement offer was $25,000. The dram shop action proceeded to a jury trial, and Terry was awarded $250,000 in damages. [Note 3]

 Terry then brought this G. L. c. 93A action against Hospitality for unfair and deceptive claim settlement practices, which was tried before a judge of the Superior Court. The judge found that Terry was not credible and had exaggerated his injuries but that, regardless, Hospitality had engaged in unfair and deceptive claim settlement practices by (1) conducting an investigation that focused on disproving Canton Junction's liability instead of objectively assessing all the evidence and (2) failing to offer a fair and equitable settlement once Canton Junction's liability became reasonably clear. The judge concluded that Hospitality's unfair and deceptive claim settlement practices were knowing or willful, and she awarded Terry double damages in the amount of $500,000, plus attorney's fees and costs. Hospitality appeals, arguing that some of the judge's findings of fact are clearly erroneous, that she applied an incorrect legal standard, and that application of the correct legal standard compels the conclusion that Hospitality did 

 Page 599 

not engage in unfair claim settlement practices. [Note 4] We affirm.

 Background. Our discussion of Hospitality's arguments turns on (1) what happened the night of the beer pong tournament; (2) Hospitality's investigation into what happened that night; and (3) Hospitality's settlement offer. We therefore recount in detail the facts found by the judge regarding those events, supplemented by information contained within various exhibits, including Hospitality's claim file, that are consistent with the judge's findings.

 1. The night of the beer pong tournament. In the early evening of February 17, 2011, Connors and Cardona went to a bar in Boston where they participated in their first beer pong tournament of the evening. The tournament was filmed by a local production company. The video footage depicted Connors and Cardona drinking, and the judge concluded that both appeared to be intoxicated. At one point, when Connors was asked about his nickname, he turned around to show the back of his shirt, which said "MVD," and explained that "MVD" stood for "most valuable drunk." Toward the end of the video footage, Connors and Cardona spoke in a loud, boisterous manner and made brief sexual gestures.

 Connors and Cardona then drove to Canton Junction with their friend, Dave Gaffey, to participate in another beer pong tournament. The tournament at Canton Junction was hosted by Paul Leonard, who was also a participant. Other participants included Leonard's friend, Sebastian Lena; Terry; and Terry's friend, Gary Reinhart.

 At around 10:30 P.M., Connors opened a tab at Canton Junction for himself, Cardona, and Gaffey and ordered six individual beers plus a pitcher of beer. While eyewitness accounts varied, multiple eyewitnesses stated at one point or another that Connors and Cardona were visibly intoxicated. Lena testified before the grand jury that Connors and Cardona became hostile and aggressive as they began losing and that Connors slapped one or more cups off the beer pong table, which prompted Terry to intervene. Connors took offense to this and needed to be calmed down. Lena also testified that Connors and Cardona continued to be argumentative and that a Canton Junction employee asked them to leave.

 Page 600 

 Connors paid his tab at around 1 A.M., wrote "Canton sucks" on the receipt, and left with Cardona. Terry and Reinhart left shortly thereafter. When Terry and Reinhart entered the parking lot, Connors and Cardona were standing near or sitting on Terry's car. Terry said, "Get the fuck off my car," at which point a fight ensued. Eyewitness accounts again varied. Terry said that Connors and Cardona attacked him; Connors and Cardona said that Terry punched Connors. Regardless, Terry wound up on the ground, where Connors and Cardona kicked him so hard that photographs taken after the fight showed the imprint of a shoe on his face. The police and emergency medical services were called to the scene, and Terry was transported to the hospital. According to medical records, Terry had abrasions to his knuckles and a right orbital facture.

 Before the police and emergency medical services arrived, Connors, Cardona, and Gaffey fled the scene in Connors's truck. Connors drove, but Gaffey had to grab the wheel at one point so Connors would not drive off the road. At around 2 A.M., after dropping off Cardona and Gaffey, Connors flipped his truck and crashed into a tree in Peabody. Police officers on the scene detected a strong odor of alcohol coming from Connors, who was arrested for driving under the influence after failing multiple field sobriety tests. Booking photographs taken shortly thereafter do not show any injuries to Connors's face, despite Connors's assertions that the fight began with Terry punching him. As we have noted, on August 24, 2011, Connors pleaded guilty to driving under the influence.

 On August 17, 2011, a week before Connors pleaded guilty to driving under the influence, Connors and Cardona were both indicted on the following crimes stemming from the fight with Terry: mayhem, assault and battery by means of a dangerous weapon causing serious bodily injury, assault and battery by means of a dangerous weapon, and assault and battery. No charges were brought against Terry. Various witnesses testified before the grand jury and related that Connors and Cardona were intoxicated and upset that they had lost the tournament. Terry and Reinhart also testified how the fight began. Terry testified that Connors and Cardona waited for him in the parking lot, that either Connors or Cardona hit Reinhart, and that Connors and Cardona both attacked Terry. Reinhart testified that he was "sucker punched" in the face and that he saw Terry being held down and repeatedly kicked in the face. As we have noted, Connors and Cardona pleaded guilty to all charges on January 3, 2013.

 Page 601 

 2. Hospitality's investigation. Hospitality's investigation of the events in question began in or around March 2011, when it learned of the fight. Adjuster Stephanie George was assigned to the claim file.

 George began by reviewing a police report of the incident. The report included statements from various witnesses, including the following statement from Leonard:

"[D]uring the tournament [Cardona] and [Connors] got increasingly aggressive with their attitude as they began losing and [Leonard] also noticed that they were both heavily intoxicated on alcohol. Apparently words were exchanged between the parties during the tournament which ultimately caused [Cardona] and [Connors] to leave the bar. [Cardona] and [Connors] waited for [Terry] out in the parking area until closing and attacked him as he was walking through the parking lot. They later sped off from the area in a silver [pickup] truck."

The police report also contained statements from Connors and Cardona made on February 22, 2011. According to Cardona, he and Connors were merely "trash talking" with Terry during the tournament. Cardona stated that after Terry came outside, Terry said "[g]et the fuck off my car" and proceeded to "remove[] his hat and punch[] [Connors] on the side of the head." Cardona further stated that Terry then "grabbed [Cardona] and fell on top of him," at which point Cardona kicked Terry to free himself. "[Connors] told a similar account" and "stated . . . that [Terry] punched him first." After reviewing the police report, George made a notation in the claim file that the report contained Connors's and Cardona's version of the events; George omitted any reference to the significantly different version of the events reported by Leonard.

 In early April and late May 2011, George met with Canton Junction's manager and bartender. They denied that Connors and Cardona were visibly intoxicated. While Canton Junction had seventeen surveillance video cameras, some of which covered areas inside the bar where Connors and Cardona might have been videotaped, [Note 5] George did not ask Canton Junction to preserve or provide her with the surveillance videotapes. At some point, the surveillance video footage was overwritten.

 Page 602 

 On April 5, 2011, George made notations in the claim file that "there [was] no evidence that alc[ohol] was a factor" and that "neither [Terry] nor [Connors or Cardona] were intox[icated]." George reached this conclusion before interviewing any of the tournament participants, and despite the contradictory information in the police report. George interviewed Leonard several months later, around July 20, 2011. Leonard told George a slightly different version from the one he had told the police. He said that Connors and Cardona "had been drinking but were able to speak and walk with[out] any difficulty." In George's report of her interview with Leonard, she noted that (1) this statement was inconsistent with Leonard's statement to the police and (2) Leonard's credibility was "questionable." George again noted that there was "no evidence of over service to any patrons."

 Little else happened with Hospitality's claim file until Terry sent his July 30, 2013, demand letter and then filed his September 19, 2013, dram shop action. [Note 6] On August 23, 2013, Hospitality reassigned the claim file to adjuster William Reynolds. [Note 7]

 Reynolds reviewed the deposition testimony that was then being taken for the dram shop action, some of which focused on whether Connors and Cardona were visibly intoxicated. Canton Junction's manager and bartender were deposed, and both testified that Connors and Cardona were not visibly intoxicated. [Note 8] However, other deposition testimony was to the contrary. Connors testified, "[R]ight now, when I evaluate the situation, the clear signs show I was intoxicated." Reynolds testified at trial that he did not put much stock in this testimony because Connors was not an expert on intoxication and was merely speculating as to his own level of intoxication. [Note 9] Gaffey testified at his deposition that Connors and Cardona appeared intoxicated toward the end of the 

 Page 603 

evening, as they were leaving or driving away from Canton Junction. Lena testified that he saw Connors and Cardona drinking but they did not appear "too" intoxicated. Leonard testified that they showed signs of intoxication, but nothing stood out as "over the top." [Note 10] Reinhart testified that there were two men inside Canton Junction who "were intoxicated and being belligerent towards [Terry]." Following Reynolds's review of all this testimony, he made a notation in the claim file that "no" witness supported that Connors or Cardona appeared intoxicated when they were served alcohol at Canton Junction. [Note 11]

 After Reynolds's review of the deposition testimony, he also made a notation in the claim file that "[a]ll testimony thus far has been that Terry was the aggressor." This conclusion appears to have been based on the deposition testimony of Connors and Cardona that Terry punched Connors first, along with deposition testimony of other individuals that Terry intervened inside Canton Junction when Connors knocked a cup off the table. Reynolds noted that the abrasions to Terry's knuckles "support[ed] [that] he threw the first punch." Reynolds did not note that there was other evidence, in the form of Connors's booking photographs and the grand jury testimony, that supported the opposite conclusion.

 Hospitality also put significant resources into investigating Terry's claim that he suffered a traumatic brain injury that 

 Page 604 

significantly affected his day-to-day life. Terry claimed, for example, that he experienced near daily migraines and that he was "in a shell" as a result of the attack. Hospitality hired Dr. Michelle Masi, a board-certified neurologist, to examine Terry and his medical records. Masi noted that "Terry's descriptions of his headaches varied from person to person, even on the same day . . . such that no reliable headache pattern [could] be established" and that Terry "reported a different distribution of headache pain and associated symptoms to different examiners, inconsistent with that expected in an established headache syndrome." Masi concluded that there was "no objective support for his subjective claims of . . . intractable headaches." Hospitality also hired an investigator, who conducted surveillance on Terry and learned that he continued to engage in everyday activities. Those activities included drinking alcohol at bars, attending sporting events, and playing in a touch football league.

 3. Hospitality's settlement offer. While Reynolds was conducting his review, and before the dram shop trial commenced, Terry sent four additional demand letters to Hospitality. The first three of those letters were sent on April 4, July 2, and December 19, 2014, and like the first letter, they all requested $5 million to settle Terry's claims. Hospitality declined to extend a settlement offer in response to any of those letters. On January 12, 2015, Terry sent his final demand letter to Hospitality, this time requesting $1 million to settle his claims. On January 16, 2015, Hospitality extended an offer of $25,000. That offer was based on Reynolds's assessment that (1) Canton Junction was twenty-five percent at fault for Terry's injuries, which Reynolds described as an orbital bone fracture and mild concussion worth $75,000, but (2) there was also a five percent chance that a jury would find that Terry suffered a traumatic brain injury worth $400,000. Terry did not accept that offer, and over a year later on February 26, 2016, he made a $975,000 counteroffer, which also was rejected. The dram shop trial in which Terry was awarded $250,000 occurred shortly thereafter.

 Discussion. General Laws c. 93A and c. 176D operate in tandem "to encourage the settlement of insurance claims . . . and discourage insurers from forcing claimants into unnecessary litigation to obtain relief." Caira v. Zurich Am. Ins. Co., 91 Mass. App. Ct. 374, 381 (2017), quoting Clegg v. Butler, 424 Mass. 413, 419 (1997). The provisions of c. 176D make it unlawful for insurance companies to "fail[] to adopt and implement reasonable 

 Page 605 

standards for the prompt investigation of claims arising under insurance policies" and to "refus[e] to pay claims without conducting a reasonable investigation based upon all available information." G. L. c. 176D, § 3 (9) (c), (d). These provisions require insurance companies to investigate insurance claims promptly and reasonably. The provisions of c. 176D further make it unlawful for insurance companies to "fail[] to effectuate prompt, fair and equitable settlement of claims in which liability has become reasonably clear." [Note 12] G. L. c. 176D, § 3 (9) (f). A consumer whose rights are affected by violations of G. L. c. 176D, § 3 (9) (c), (d), or (f), may bring an action under c. 93A and recover double or treble damages for knowing or willful violations. [Note 13] See G. L. c. 93A, § 9 (1), (3).

 Hospitality claims that it conducted a prompt and reasonable investigation that revealed good faith disagreements on all aspects of Canton Junction's liability, including whether Connors and Cardona were visibly intoxicated when they were served alcohol at Canton Junction, whether they -- versus Terry -- were the aggressors, and the extent of Terry's injuries. Thus, Hospitality asserts that, notwithstanding the fact that a jury awarded Terry ten times the amount of Hospitality's $25,000 settlement offer, that settlement offer was reasonable.

 1. Hospitality's flawed investigation. Hospitality's obligation to conduct a prompt and reasonable investigation required it to take "basic steps toward obtaining an independent or neutral assessment of . . . potential fault." McLaughlin v. American States Ins. Co., 90 Mass. App. Ct. 22, 32 (2016). Hospitality could not "cherry-pick[] . . . facts favorable to [it]" or disregard unfavorable evidence and, instead, had to assess the evidence objectively. M.C. Gilleran, The Law of Chapter 93A § 9.36 (2d ed. 2007 & Supp. 2021-2022).

 As found by the judge, Hospitality violated its obligation to conduct a prompt and reasonable investigation by "cherry-pick[ing] facts that supported the position staked out from the 

 Page 606 

beginning - that the insured's liability was doubtful - and discarded, or at least diminished the significance of, the considerable amount of contrary information." As the judge put it, Hospitality "engaged in a results-oriented treatment of the evidence related to the claim, rather than a considered appraisal of it, based upon 'all available information,' G. L. c. 176D, [§ 3 (9) (d)]." As our recitation of Hospitality's investigation makes plain, the record amply supports these findings.

 From the start of Hospitality's investigation, George focused on the favorable information in the police report and, shortly thereafter, concluded that "there [was] no evidence that alc[ohol] was a factor." This was an inaccurate statement given the other, unfavorable, information in the police report, which included Leonard's statement that Connors and Cardona were "heavily intoxicated." Reynolds similarly concluded that "no" witness supported that Connors and Cardona appeared intoxicated when they were served alcohol at Canton Junction. This, too, was inaccurate, as evidenced by Reynolds's efforts to explain away all the testimony that Connors and Cardona were visibly intoxicated. For example, Reynolds disregarded Connors's own testimony that he was intoxicated on the basis that Connors was not an expert in intoxication. Reynolds also explained away the video footage in which Connors and Cardona appeared intoxicated before they arrived at Canton Junction, stating that they were "posturing for the cameras." [Note 14] See note 9, supra. In addition, Reynolds largely ignores that they ordered six beers and a pitcher of beer after they had been drinking at another bar and that their behavior was such that they were asked to leave Canton Junction.

 While Hospitality consistently found reasons to disregard unfavorable evidence, Hospitality did not apply the same exacting scrutiny to favorable evidence. For example, Hospitality relied on statements made by the bartender that Connors and Cardona were not visibly intoxicated and ignored the fact that the bartender falsely testified that he was certified in the training and intervention procedures for servers of alcohol at the time of the incident. While Hospitality knew about the bartender's false testimony, that did not change Hospitality's view that the bartender was a credible witness. Moreover, while Hospitality could have tested the truth of whether Connors and Cardona were not visibly 

 Page 607 

intoxicated by requesting that Canton Junction produce its surveillance videotapes, Hospitality failed to do so.

 Hospitality's assessment of who started the fight also was not independent or neutral. In concluding that Terry was the aggressor, Hospitality relied on the self-serving statements made by Connors and Cardona but discounted the significance of their guilty pleas. Hospitality also relied on the fact that Terry had abrasions on his knuckles but discounted the significance of Connors's booking photographs and the grand jury testimony.

 In short, the record is replete with examples of Hospitality's failure to assess the evidence objectively. Hospitality's failure to do so violated its obligation to conduct a prompt and reasonable investigation. See McLaughlin, 90 Mass. App. Ct. at 32.

 2. Unreasonable settlement offer. Hospitality also had an obligation to "effectuate [a] prompt, fair and equitable settlement[]" once liability became "reasonably clear." G. L. c. 176D, § 3 (9) (f). Determining when liability became reasonably clear requires application of an objective standard that "calls upon the fact finder to determine whether a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insure[d] was liable to the plaintiff." Chiulli v. Liberty Mut. Ins., Inc., 97 Mass. App. Ct. 248, 255 (2020), quoting Demeo v. State Farm Mut. Auto. Ins. Co., 38 Mass. App. Ct. 955, 956-957 (1995). Liability is not reasonably clear if an element of the underlying claim is subject to a good faith disagreement. See Clegg, 424 Mass. at 418. Accord Chiulli, supra at 256. Once liability became reasonably clear, Hospitality had an obligation to extend a reasonable settlement offer, regardless of whether Terry would have accepted that offer. See Rhodes v. AIG Dom. Claims, Inc., 461 Mass. 486, 495 (2012).

 In determining when liability became reasonably clear, the judge focused on Terry's dram shop claim. [Note 15] For Canton Junction to be liable on that claim, Connors's and Cardona's intoxication must have been "apparent at the time [they were] served by [Canton Junction]." [Note 16] Douillard v. LMR, Inc., 433 Mass. 162, 164-165 (2001). Accord Vickowski v. Polish Am. Citizens Club of 

 Page 608 

Deerfield, Inc., 422 Mass. 606, 609 (1996); Cimino v. Milford Keg, Inc., 385 Mass. 323, 327-328 (1982). Where Terry did not allege intentional conduct or willful, wanton, or reckless conduct, Canton Junction's liability also could have been defeated by a showing that Terry was at least fifty-one percent responsible for his own injuries. See G. L. c. 231, § 85; Boyd v. National R.R. Passenger Corp., 446 Mass. 540, 548 n.11 (2006). Here, whether Terry was primarily responsible for his own injuries turned on whether he started the fight.

 The judge determined that, by January 8, 2015, [Note 17] it was reasonably clear that Connors and Cardona were visibly intoxicated when they were served alcohol at Canton Junction and that Connors and Cardona started the fight. The judge also found that Terry's accounts of his injuries were inconsistent and that, despite Terry's assertions to the contrary, he continued to engage in everyday activities. Regardless, the judge found that the objective medical records showed that Terry sustained a right orbital fracture that had not fully healed three years later. The judge described this as a "lasting, serious injury." Accordingly, the judge determined that, by January 8, 2015, no reasonable insurer would have failed to offer at least $75,000, which was the amount that Reynolds himself estimated Terry's injuries to be worth.

 Hospitality makes several arguments challenging the judge's reasoning. First, Hospitality argues that the judge erroneously found that statements made by Gaffey, Leonard, Lena, and Reinhart supported the conclusion that Connors and Cardona were visibly intoxicated when they were served alcohol at Canton Junction. The judge's reliance on the witnesses' statements was not misplaced. Gaffey testified that Connors and Cardona appeared intoxicated to him by the time they were leaving Canton 

 Page 609 

Junction. [Note 18] Leonard told the police that Connors and Cardona were "heavily intoxicated." Lena testified that Connors and Cardona were not "too" intoxicated, implying that they were exhibiting at least some signs of intoxication. Reinhart testified that there were two men inside Canton Junction who "were intoxicated and being belligerent towards [Terry]." [Note 19] Moreover, the judge did not rely solely on the statements of Gaffey, Leonard, Lena, and Reinhart in concluding that Connors and Cardona were visibly intoxicated when they were served alcohol at Canton Junction.

 Additional evidence overwhelmingly pointed to the fact that Connors and Cardona were visibly intoxicated when they were served alcohol at Canton Junction. That evidence included the video footage in which Connors and Cardona appeared intoxicated at the Boston bar before they even arrived at Canton Junction, the multiple alcoholic drinks they were served at Canton Junction, and their aggressive and argumentative behavior inside Canton Junction. See Cimino, 385 Mass. at 328 (patron's "loud and vulgar conduct" and defendant's service to him of large number of alcoholic drinks were "each sufficient to put the defendant on notice that it was serving a man who could potentially endanger others"). Contrast Kirby v. Le Disco, Inc., 34 Mass. App. Ct. 630, 632 (1993) (no evidence that patron was "aggressive, troublesome or even loud and vulgar"). Connors's subsequent car crash and arrest for driving under the influence of alcohol further bolstered the conclusion that he was visibly intoxicated when he was served alcohol at Canton Junction. See Douillard, 433 Mass. at 165-166 (evidence of later intoxication may be "admitted for purposes of bolstering other evidence concerning a patron's condition at the time alcohol was served"). The judge's conclusion was not clearly erroneous.

 Second, Hospitality argues that the judge looked to how she, personally, would have decided Terry's dram shop claim rather than assess "whether a reasonable person, with knowledge of the 

 Page 610 

relevant facts and law, would probably have concluded, for good reason, that [Canton Junction] was liable to [Terry]." Chiulli, 97 Mass. App. Ct. at 255. This argument is similarly unavailing. The judge correctly articulated the proper standard, and nothing in her analysis demonstrates that she did not apply it. [Note 20]

 Third, Hospitality argues error in the judge's determination that liability was reasonably clear by January 8, 2015. However, we discern no error in the judge's determination that, by January 8, 2015, it was reasonably clear that Connors and Cardona were visibly intoxicated when they were served alcohol at Canton Junction, that they started the fight, and that Terry sustained a serious injury worth more than $25,000.

 Regarding visible intoxication, we have already discussed the overwhelming evidence supporting the judge's finding that Connors and Cardona were visibly intoxicated when they were served alcohol at Canton Junction. As to whether Connors and Cardona started the fight, an overwhelming amount of evidence again pointed to the fact that they -- not Terry -- were the aggressors. That evidence included the fact that Connors and Cardona were asked to leave Canton Junction because of their aggressive and argumentative behavior, the evidence showing that they waited around in the parking lot while leaning or sitting on Terry's car, the photographs showing that Connors had no facial injuries, and, perhaps most persuasive, the fact that Connors and Cardona later pleaded guilty to criminal charges arising from the fight with Terry. [Note 21]

 Likewise, there was no error, as Hospitality argues, in the judge's determination that Hospitality's $25,000 settlement offer was unreasonable. While the record amply supports the judge's finding that Terry was not credible and that he had exaggerated 

 Page 611 

his injuries, Terry's lack of credibility did not absolve Hospitality from making a reasonable settlement offer based on what the uncontroverted objective evidence showed his damages to be. [Note 22] Cf. Rhodes, 461 Mass. at 495 ("Several decisions of this court have established that an insurer has the burden to prove that its settlement offer was reasonable, and a plaintiff need not prove that she would have accepted a reasonable offer, had one been made"). That evidence included (1) photographs showing that Terry was kicked in the face so hard that the kick left the imprint of a shoe, (2) medical records showing that Terry suffered a right orbital facture that remained unhealed three years later, and (3) Reynolds's own assessment that Terry's injuries were worth $75,000. In sum, in this fact-driven case, the evidence supports the judge's conclusion that Hospitality's $25,000 settlement offer was unreasonable. [Note 23], [Note 24] 

 Judgment affirmed.

FOOTNOTES
[Note 1] The lawsuit also asserted claims against Connors, Cardona, and BPong, LLC. 

[Note 2] General Laws "c. 231, § 60J (commonly referred to as the dram shop act), . . . prescribes the procedural requirements applicable to '[e]very action for negligence in the distribution, sale or serving alcoholic beverages to a minor or to an intoxicated person.'" Bayless v. TTS Trio Corp., 474 Mass. 215, 216 (2016), quoting G. L. c. 231, § 60J. 

[Note 3] The judgment was against Canton Junction, Connors, and Cardona. 

[Note 4] Hospitality filed posttrial motions, including for reconsideration and to alter or amend the findings and judgment, which were denied. Although its notice of appeal references the posttrial motions specifically, and Hospitality makes occasional references as to what the judge stated in her denial of the motions, Hospitality does not make a separate argument related to the posttrial motions. 

[Note 5] None of the surveillance video cameras focused on the parking lot where the fight occurred. 

[Note 6] In the intervening time, Hospitality's claim file was closed due to lack of pursuit by Terry. The claim file was subsequently reopened when Terry sent his demand letter. By then, Connors and Cardona had been indicted, and had pleaded guilty to, the crimes arising from the incident. 

[Note 7] George's employment with Hospitality had been terminated by then. 

[Note 8] The bartender also testified that he was "TIPS certified," meaning that he was certified in the training and intervention procedures for servers of alcohol. However, as Hospitality later learned, the bartender did not become TIPS certified until after Terry was injured. 

[Note 9] In addition, while Reynolds had access to the video footage of the first beer pong tournament recorded by the production company, that evidence did not alter his view of whether Connors and Cardona were intoxicated because, as he noted in the claim file, it appeared to Reynolds as though Connors and Cardona were "pretending to be intoxicated" and "posturing for the cameras." 

[Note 10] Leonard's testimony on this point was less emphatic than his initial statement to the police that Connors and Cardona were "heavily intoxicated." The parties have given two different explanations for Leonard's inconsistent statements, both of which have support in the record: (1) Leonard initially exaggerated the extent to which Connors and Cardona appeared intoxicated because he was angry that Terry had been attacked or (2) Leonard later downplayed the extent to which Connors and Cardona appeared intoxicated because he was concerned about his own liability for hosting the tournament. 

[Note 11] In addition, Reynolds also had access to a report prepared by James Staples, an expert hired by Terry who happened to be listed on Hospitality's website as approved to train insureds on the safe service of alcohol. Staples reviewed the video footage and wrote a report stating that Connors and Cardona appeared intoxicated. After Staples's report was sent to Hospitality, Staples's name was removed from its list of approved trainers. 

 We note that Hospitality argues that it had no obligation to consider Staples's report because it was ruled inadmissible in the dram shop action. Hospitality cites no authority for its argument, nor are we aware of any authority that supports the proposition that review of an insurance claim should be limited to evidence that complies with the standards of admissibility in a civil trial. Indeed, G. L. c. 176D, § 3 (9) (d), makes it unlawful for an insurance company to "refus[e] to pay claims without conducting a reasonable investigation based upon all available information" (emphasis added). 

[Note 12] Whether an insurer has conducted a prompt and reasonable investigation and when liability has become reasonably clear are factual determinations. See Bobick v. United States Fid. & Guar. Ins. Co., 57 Mass. App. Ct. 1, 3-4 (2003), S.C., 439 Mass. 652, and cases cited. We therefore review the judge's findings on these points for clear error. See Rhodes v. AIG Dom. Claims, Inc., 461 Mass. 486, 495 (2012). 

[Note 13] Hospitality does not make any separate arguments regarding the judge's conclusion that Hospitality's violations were knowing or willful. 

[Note 14] The fact that Reynolds was unwavering in this conclusion despite Staples's report, and that Hospitality responded to Staples's report by removing his name from its list of approved trainers, is particularly revealing. See note 11, supra. 

[Note 15] Hospitality argues that the judge did not make any findings regarding when liability became reasonably clear on Terry's negligent security claim. Even assuming this to be true, it is of no consequence where the judgment may be affirmed on the basis that Hospitality failed to affect a prompt, fair, and equitable settlement once liability became reasonably clear on Terry's dram shop claim. 

[Note 16] Hospitality argues that the judge did not apply this standard and instead concluded that Canton Junction was liable if Connors and Cardona became intoxicated at Canton Junction. However, as the judge explained in her order on Hospitality's motion to alter or amend the judgment, she "properly assessed Hospitality's liability based on [the] extensive evidence that Connors and Cardona exhibited signs of intoxication at the time Canton Junction served them their last drinks." 

[Note 17] This date coincided with when an attachment issued against Canton Junction in the dram shop action. Hospitality argues that the judge erred in relying on the attachment to determine when liability became reasonably clear. Even assuming that there is merit to this argument, the judge made plain in her order on Hospitality's motion to alter or amend the judgment that she would have determined that liability was reasonably clear in January 2015 even if the attachment had not issued. As she explained, "with the information available to Hospitality, liability should have become reasonably clear before the attachment issued." 

[Note 18] While this was not direct evidence that Connors and Cardona were visibly intoxicated when they were served alcohol at Canton Junction, evidence of later intoxication may be "admitted for purposes of bolstering other evidence concerning a patron's condition at the time alcohol was served." Douillard, 433 Mass. at 165-166. 

[Note 19] Reinhart also testified that he was not sure whether those two individuals were the same two individuals who punched him and attacked Terry. Regardless of whether Reinhart could identify the two men who punched him and attacked Terry as the two men who were intoxicated and belligerent inside Canton Junction, that is a permissible inference given all the other evidence. 

[Note 20] Hospitality's argument appears to be premised on the idea that where Terry's dram shop claim presented triable issues of fact, liability could not have been reasonably clear. Hospitality asserts, for example, that a reasonable fact finder assessing Terry's dram shop claim could have concluded that Connors and Cardona were pretending to be intoxicated in the video footage created for the beer pong documentary. However, as we have held, the existence of triable issues of fact does not necessarily mean that liability is not reasonably clear. See Chiulli, 97 Mass. App. Ct. at 257, and cases cited. 

[Note 21] While Hospitality argues that the guilty pleas are not "conclusive," and that Connors and Cardona may have pleaded guilty to avoid jail time, this argument is symptomatic of the problematic way in which Hospitality reviewed Terry's claims from the start. Instead of assessing the evidence objectively, Hospitality continues to find reasons to disregard unfavorable evidence. 

[Note 22] We are therefore unpersuaded by Hospitality's argument that the judge's findings regarding Terry's lack of credibility are incongruous with her determination that liability was reasonably clear. 

[Note 23] Hospitality's remaining argument regarding Terry's expert witness requires little discussion. Hospitality argues that Terry should not have prevailed in the absence of credible expert testimony that Hospitality's claim settlement practices fell below the industry standard of care. First, Terry did present expert testimony on this point, although the judge gave it little weight. In any event, while expert testimony on this point may be necessary in some circumstances, it is not required in all cases alleging unfair and deceptive claim settlement practices. See, e.g., Bobick v. U.S. Fid. & Guar. Co., 439 Mass. 652, 661 (2003). Here, where Hospitality plainly failed to objectively assess the evidence or to extend a reasonable settlement offer once liability became reasonably clear, no expert testimony was needed. 

[Note 24] Terry is entitled to reasonable appellate attorney's fees under G. L. c. 93A, § 4, and his request for those fees is therefore allowed. Terry may file his application for reasonable appellate attorney's fees within fourteen days of the date of this decision, and Hospitality shall have fourteen days thereafter in which to respond. See Fabre v. Walton, 441 Mass. 9, 10-11 (2004). 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.