NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-1120

ERIKA MCDADE[1]

vs.

JUSTIN R. BENOIT & others.[2]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

In this unfair settlement practices action, Erika McDade claims that Safety Insurance Company (Safety) violated the requirements of G. L. c. 93A and G. L. c. 176D by failing to offer her a reasonable settlement following a car accident between McDade and Safety's insured. After a bench trial on these claims, a Superior Court judge found that Safety made reasonable offers to McDade based on its assessment of her injuries and comparative fault and thus did not engage in unfair settlement practices. Judgment entered accordingly for Safety, and McDade appeals. We affirm.

Background. In August 2013 Justin Benoit, a driver for Brodie, Inc., made a left turn across McDade's lane of travel to

---

[1] Formerly known as Erika McKenzie.

[2] Brodie, Inc., and Safety Insurance Company.

turn into a parking lot. McDade struck the rear side of Benoit's truck, sustaining damage to her car. An ambulance transported McDade to the emergency room, and she was later treated for neck and back pain. Brodie, Inc., was insured by Safety.

Safety opened a claim on the accident and assigned Christina Parsons, a veteran claims adjuster, to the accident file. Parsons took a statement from McDade, who reported that her neck and back issues from the accident required her to quit her part-time nannying job and seek regular chiropractic care. McDade further reported that she missed three days of work as a nurse before returning full time.

Parsons also spoke to two eyewitnesses, Sonja Houle and Charles Sidden. Houle, who was driving behind McDade and saw Benoit's truck make the left turn, stated that McDade seemed a "little late" in applying her brakes. Sidden, who was driving behind the truck, stated that the truck was three-quarters of the way into the parking lot when McDade hit it. Based in part on these statements, Parsons determined that McDade had some liability for the accident and informed her that Safety would pay for eighty percent of the property damage.

Upon assigning eighty-percent liability to Benoit, Parsons set an initial loss reserve amount of $7,929 for McDade's bodily injury claim. The loss reserve was meant to represent the

"worst-case scenario" for Safety.  The initial loss reserve amount was based on McDade's ambulance ride to the emergency room, her negative x-rays, and her chiropractic care.  By April 2014 Parsons increased the loss reserve to $15,000 after McDade's insurer, Commerce Insurance Company (Commerce), reported that McDade's medical bills exceeded $8,000.  Later that year, after Commerce made a subrogation demand, the matter went to intercompany arbitration at which the arbitrator found that Safety's position that its insured was eighty percent liable was a "reasonable compromise" given the circumstances of the accident.

In March 2015 Safety received a demand for $150,000 from McDade.  The demand included a medical report from Dr. George Kasparyan, a nontreating orthopedic surgeon, who diagnosed McDade with chronic pain syndrome and chronic cervical, thoracic, and lumbar sprain.  Based on the American Medical Association (AMA) guidelines, Dr. Kasparyan opined that McDade had a twenty-two percent "permanent partial impairment of the whole person."  The demand also included documented medical expenses of $11,513.75 and stated that McDade had $535 in lost earnings.

In response to the demand, Parsons increased the loss reserve to $40,000, and Safety retained a medical expert to review McDade's medical records.  After McDade later reduced her

demand to $130,000, Safety countered with an offer of $12,000, justifying that amount based on its attribution of some fault to McDade and its disagreement with the extent of her injuries. Soon thereafter, Safety received a report from its medical expert, who opined that the "records provided no objective finding of an 'anatomic abnormality' causally related to the accident." Safety then retained a second expert, Dr. Ryan Friedberg, to obtain an opinion regarding Dr. Kasparyan's conclusion that McDade had a permanent whole person impairment of twenty-two percent.

Safety was waiting to hear from Dr. Friedberg when McDade sent a c. 93A demand letter in September 2015. A few days later, Safety received Dr. Friedberg's report in which he concluded that McDade's diagnoses of cervical, thoracic, and lumbar strain were causally related to the accident, but that it would be unusual to classify for permanency based on those injuries. Dr. Friedberg also opined that Dr. Kasparyan's finding of a twenty-two percent whole person impairment was "significantly exaggerated" and that that figure would more likely be between two and eight percent.

Parsons conducted an updated valuation of McDade's claim based on Dr. Friedberg's report. Parsons estimated the claim range to be between $11,405 and $16,182 considering McDade's comparative negligence, the soft tissue nature of her injuries,

4

the lack of objective diagnostic testing, and the fact that she missed only three days of work. The approved range was up to $18,000. After crediting certain amounts based on Dr. Friedberg's assessment of McDade's whole body impairment, Parsons recommended increasing the offer to $15,000. William Bradley, Parsons's supervisor, reviewed and approved the offer.

When the parties were unable to reach a settlement, McDade filed suit in October 2015. Id. During discovery Dr. Friedberg performed a medical examination of McDade, after which he concluded that her medical treatment was reasonable through March 2014, when she came to a "medical endpoint." Dr. Friedberg again opined that Dr. Kasparyan's finding of a permanent whole person impairment of twenty-two percent was "significantly exaggerated" and not consistent with the AMA guidelines. In addition, Dr. Friedberg explained in his deposition that the permanency designation under the AMA guidelines means that improvement is not expected over a one-year timeframe, not that the impairment will necessarily persist over a person's lifetime.

The underlying tort claim proceeded to a jury trial in January 2018. The jury found that the defendants were negligent and that McDade was not comparatively negligent and awarded her damages of $225,000. The c. 93A claim against Safety then

5

proceeded to the bench trial, after which an amended judgment entered dismissing McDade's complaint against Safety.

Discussion. On appeal from a decision after a bench trial, we accept the judge's findings of fact unless they are clearly erroneous and review the judge's legal conclusions de novo. See Cavadi v. DeYeso, 458 Mass. 615, 624 (2011). Whether particular conduct is unfair or deceptive under G. L. c. 93A is a question of fact, but whether that unfair or deceptive conduct rises to the level of a c. 93A violation is a question of law. See H1 Lincoln, Inc. v. South Washington St., LLC, 489 Mass. 1, 13-14 (2022). The parties agree that, because the judge's decision was based solely on documentary evidence, we may draw our own conclusions from the record. See U.S. Bank Nat'l Ass'n v. Schumacher, 467 Mass. 421, 427 (2014).

1. Failure to effectuate reasonable settlement. "General Laws c. 93A and c. 176D operate in tandem 'to encourage the settlement of insurance claims . . . and discourage insurers from forcing claimants into unnecessary litigation to obtain relief.'" Terry v. Hospitality Mut. Ins. Co., 101 Mass. App. Ct. 597, 604 (2022), quoting Caira v. Zurich Am. Ins. Co., 91 Mass. App. Ct. 374, 381 (2017). The touchstone of c. 176D is its requirement that an insurer "effectuate [a] prompt, fair, and equitable settlement" when liability is "reasonably clear." G. L. c. 176D, § 3 (9) (f). "[L]iability encompasses both fault

6

and damages." Clegg v. Butler, 424 Mass. 413, 421 (1997). In assessing the adequacy of a settlement offer, we must determine "whether, in the circumstances, and in light of the complainant's demands, the offer [was] reasonable," id., quoting Calimlim v. Foreign Car Ctr., Inc., 392 Mass. 228, 234 (1984), judged at the time it was made, see Silva v. Norfolk & Dedham Mut. Fire Ins. Co., 91 Mass. App. Ct. 413, 417-418 (2017). Even a serious undervaluation of a claim may not render an insurer liable without evidence that the insurer acted "deliberately to derail the settlement process." Parker v. D'Avolio, 40 Mass. App. Ct. 394, 395 (1996).

At trial Safety did not contest that it had some liability for the accident and was therefore obligated to tender a reasonable settlement offer to McDade. The issue was whether Safety's offer of $15,000 was a reasonable assessment of McDade's damages. We agree with the judge that it was.

As set forth by the judge, there were multiple circumstances supporting the reasonableness of Safety's offer. At the time of the offer in September 2015, McDade's medical bills were less than $12,000 and subject to an approximate offset of $8,000 in personal injury protection benefits. Dr. Friedberg provided an expert opinion that McDade's injuries, which were soft-tissue in nature, were likely not permanent and that she had only a small percentage of impairment. It was

7

reasonable for Safety to rely on Dr. Friedberg's opinion, especially given that most of McDade's medical expenses were for chiropractic treatment, she had not sought treatment for over a year since March 2014, and she returned to her rigorous job as a nurse within days after the accident. Moreover, given the eyewitness statements and the arbitrator's decision, Safety had a basis to believe that McDade was partly at fault for the accident. In light of all this information, we agree with the judge that Safety had legitimate reasons to be skeptical of McDade's characterization of the extent of her injuries and that its offer was thus reasonable under c. 176D. See Silva, 91 Mass. App. Ct. at 418.

We are unpersuaded by McDade's argument that Safety's offer was unreasonable because it failed to factor in her life expectancy. This argument appears to be based on Bradley's deposition testimony that he would typically consider life expectancy when evaluating a permanent impairment claim. But even assuming that this testimony established that a reasonable insurer would have considered life expectancy in these circumstances, Bradley further testified that he did in fact consider McDade's life expectancy when approving Parsons's offer. Although Parsons testified, somewhat ambiguously, that she looked at McDade's life expectancy but did not "consider that as part of [the] permanency value," Bradley explained that

8

the settlement value of claims is determined according to an "experience-based evaluation" under which the adjuster "can look at permanency in terms of the life expectancy or . . . can also take into account . . . other variables depending on the person and the situation."  Thus, even if Parsons did not "directly factor" in McDade's life expectancy, Bradley still believed that the "number that she came up with [was] reasonable" given all the information known to him, which, as he expressly testified, included life expectancy.  McDade's argument therefore fails if for no other reason than it is refuted by Bradley's testimony.

We are also unpersuaded by McDade's argument that the judge erred by declining to credit her insurance expert.  In his deposition testimony, the expert opined that Safety's offer was unreasonably low and that the settlement value of the case was approximately $125,000.  But as the judge explained, the expert did not base his opinion on information in the record and failed to review documents used by Safety to support its valuation of McDade's claim.  Furthermore, when asked, the expert was unable to identify any industry standards or guidelines that he used to form his opinion.  Because the expert's opinion was conclusory and not based on any identified reliable methodology, we discern no error in the judge's decision not to credit his testimony. See Palandjian v. Foster, 446 Mass. 100, 110 (2006).

2.  Failure to train.  In passing, McDade suggests that Safety independently violated c. 176D by failing to train its adjusters on how to handle permanent impairment cases.  But McDade fails to explain why any inadequacy in training is relevant if the offer itself was reasonable under c. 176D, as we have determined it was.  She cites no legal authority to support her position, nor does she point to any credible evidence in the record showing that Safety's training was not in line with industry standards.  As her conclusory assertions do not rise to the level of appellate argument, we need not consider them.  See Halstrom v. Dube, 481 Mass. 480, 483 n.8 (2019).

3.  Failure to investigate.  Likewise, McDade has not adequately developed her argument that Safety violated c. 176D by failing to conduct a reasonable investigation, purportedly by engaging in improper tactics with respect to Houle's eyewitness statement.  In any event the judge carefully explained why Safety did not act improperly and why its investigation was

otherwise reasonable.  We agree with the judge's reasoning.[3]

Amended judgment dated June
10, 2021, affirmed.

By the Court (Wolohojian,
Shin & Ditkoff, JJ.[4]),

*Joseph F. Stanton*

Clerk

Entered: November 6, 2023.

---

[3] McDade's request for double or treble damages and attorney's fees is denied.

[4] The panelists are listed in order of seniority.

11